**Robert W. HEINEMANN**

v.

**The UNITED STATES.**

**No. 202–79C.**

United States Claims Court.

March 1, 1984.

Wilsie H. Adams, Jr., Washington, D.C., for plaintiff.

Claud A. Daigle, Jr., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

COLAIANNI, Judge.

On May 15, 1979, plaintiff filed the instant suit in the United States Court of Claims, seeking relief against the United States for an alleged patent infringement. Plaintiff asserted three separate grounds for relief. First, he claimed entitlement to damages for patent infringement under 28 U.S.C. § 1498. Second, plaintiff sought damages under 35 U.S.C. § 183 due to the defendant's imposition of a secrecy order on plaintiff's invention from 1966 to 1972 and for the alleged use of the invention during this period. Finally, plaintiff alleged a taking of his invention under the fifth amendment. Defendant moved to dismiss all three claims. On April 16, 1980, the Court of Claims granted defendant's motion as to plaintiff's second count for relief, but denied it as to his first and third. *Heinemann v. United States*, 233 Ct.Cl. 479, 620 F.2d 874 (1980).

Subsequently, on January 30, 1981, the Court of Claims ordered that consideration of plaintiff's claim by the trial judge be bifurcated. *Heinemann v. United States*, 226 Ct.Cl. 622 (1981). Under that order the issues of whether the government was entitled to an assignment of, or a royalty-free license in, the invention were to be considered first, with the infringement claim postponed for later determination. Therefore, the sole issues before this court are those of assignment and royalty-free license. Two preliminary issues, however, concern what standard should be used in determining the invention rights and what body—this court or plaintiff's employing agency—should make that determination. Because the court finds that the determination of invention rights should be made by the agency, and not by this court, under the standards framed by Executive Order 10096, proceedings are suspended pending the agency's final determination and any review by the Commissioner of Patents and Trademarks that the parties may seek.

### Facts

Plaintiff's association with Picatinny Arsenal extends back to 1957. In February of that year, he joined Picatinny as a GS–11 general chemist. By 1963, Mr. Heinemann had risen to the position of a GS–13 supervisory physical scientist in charge of the Explosive Devices Unit within the Artillery Ammunition Laboratory.

In mid- to late-1963, Mr. Heinemann decided to leave Picatinny for a higher-grade position in Washington, D.C. Shortly after announcing his resignation, he was approached by Mr. Robert Vogel, the head of Picatinny's Ammunition Development Division. Mr. Vogel asked Mr. Heinemann to stay and assured him of a GS–14 position at Picatinny. Subsequently, Mr. Victor Lindner, the head of the Ammunition Engineering Directorate and Mr. Vogel's direct superior, gave Mr. Heinemann the same assurance, specifically indicating that a position would be found for him in the Warheads and Special Projects (WASP) Laboratory.

The WASP Laboratory was one of several laboratories and branches within the Ammunition Development Division. At this time, the WASP Laboratory was responsible for the research, design, and development of bombs, guided missile warheads, mines, grenades, demolition devices, special warfare munitions, and accessories for those items. The bulk of work in the WASP Laboratory was concentrated in the Selected Ammunition Section. This section was directed to develop improved conventional munitions, specifically concentrating its research and development effort on utilizing the concepts of clustered munitions and controlled fragmentation.[1] Much of the laboratory's work at this time involved the research and development of anti-armor munitions and the means of incorporating sensors or guidance systems into them.

On November 5, 1963, Mr. Heinemann joined the WASP Laboratory. He had no approved job description. Rather, he received his assignments and job duties from the chief of the WASP Laboratory, Mr. Frederick Saxe. Plaintiff worked directly for Mr. Saxe and within six months of arriving at the laboratory was designated "Assistant to the Chief." On December 26, 1965, an approved job description for plaintiff's position as a GS–13 at the WASP Laboratories finally became effective.[2] That description, in pertinent part, summarized plaintiff's job responsibilities as follows:

> To serve as a scientific advisor and consultant to the Chief, Warheads and Special Projects Laboratory, responsible for furnishing expert advice and assistance in the field of physical science and engineering. To develop long and short-range plans for accomplishment of laboratory research objectives. To control and coordinate all supporting research functions in conjunction with the Selected Ammunition Program and Aircraft Weaponization Program. To conceive, screen, and formalize proposed tasks and organize these into cohesive well-integrated programs to result in substantial improvements in ammunition now being produced and leading to end item development programs in the future. To maintain liaison with research facilities to keep alert of developments in the field of munitions.

In late 1965, Mr. Heinemann conceived and developed the invention that is now the subject of this suit. He drafted an invention disclosure, entitled "Low Density Indirect Fire Weapon System," and submitted it to the Picatinny legal office on January 7, 1966. That invention disclosure described an intelligent munition system incorporating the concept of controlled fragmentation for the defeat of tanks and armored personnel carriers. Plaintiff's disclosure described the munition system as follows:

1. A clustered munition is a munition, such as a bomb or missile warhead, that is divided into several submunitions. Each submunition carries its own explosive charge, detonating after the group of submunitions has been dispersed over the target area. Controlled fragmentation involves designing the munition or its parts to create, upon detonation, metal fragments of previously determined size and shape. Both concepts are directed to improving the effectiveness of munitions, first by spreading their fragments over large areas and second by producing fragments of a size and velocity appropriate for disabling the intended target.

2. Despite the efforts to establish plaintiff's job as a GS–14 position, plaintiff remained a GS–13 for several years. For purposes of determining whether the government would be entitled to the assignment of, or royalty-free license in, plaintiff's invention, however, plaintiff's grade is irrelevant.

The approach involves a munition, which drops from the air via a retardation or drag device. It could be dropped from an aerial vehicle or ejected from a missile. The system is shown in the attached schematic drawing. It is composed of the retardation device which may be a parachute, wing or similar drag device (a), an explosive, forward firing warhead (b) and a directional sensor antenna (c) coupled to the warhead, electronics (d) and fuze (e). The drag device, coupling (f) and spin tabs (j) impart a spin and oscillation to the sensor and coupled warhead so that it oscillates through an angle, while it spins and therefore scans an area below it. The warhead is suspended at an angle (i) to the horizantal [sic] so as to cover a larger view area. A glide device such as a wing in lieu of the retardation device could permit it to cover a larger area. The warhead has a forward spray angle (k) controlled by a wave shaper (h) which is matched and directionally oriented with that of the sensor. The directional sensor can be of the passive, semi-active or active type. It responds to the signature of the target, which may be inherent to the target or induced in the target. As the munition descends, possibly glides, spins and oscillates, the sensor scans an area of land below. If it receives a proper target signature, it immediately initi-

ates the explosive charge and a lethal spray engulfes [sic] the target.

On January 7, 1966, plaintiff executed and forwarded to the Picatinny legal office the three necessary forms for disclosing the invention now at issue. Those forms were: The record of invention (AMC Form 1255), the patent disclosure data sheet (AMSMU Form 78R), and the invention rights questionnaire (DA Form 2871).[3] Plaintiff testified that he requested, through the invention rights questionnaire, a rights determination but none was made.[4]

Mr. Heinemann's invention, upon disclosure, was classified "secret." At this time, the Frankford Arsenal in Philadelphia processed all patent applications coming out of Picatinny. On May 16, 1967, patent counsel at Frankford found that Mr. Heinemann's disclosure lacked information sufficient to permit him to determine patentability. Counsel stated that the disclosure, although setting forth a concept, failed to provide enough detail "to permit one skilled in the art to make and practice the invention." Counsel requested additional information, but apparently none was given.

On March 13, 1970, plaintiff's invention was again reviewed by the government, this time through the Invention Evaluation Board (IEB) at Picatinny.[5] The IEB initially was reluctant to proceed with plaintiff's invention. In late 1971 or early 1972, how-

---

**3.** In WASP Laboratory circular No. 19–10, issued by Mr. Saxe on October 26, 1965, these three forms were described as follows:

"The *Invention Rights Questionnaire* is required to. determine whether the rights to an invention belong to the inventor, to the Government, or to both. If all rights are to be assigned to the government, as is usually done when an invention is made as a normal outgrowth of one's regular work, it is only necessary to complete Paragraph 1 of the form. If the inventor wishes to claim some or all rights, detailed data regarding the circumstances of the invention and its relation to the inventor's employment are required. Some portions must be completed by the inventor's superviser [sic]. This form must be kept unclassified.

"The *Military Invention Record* is an affidavit stating that a particular invention was made by a specified person or persons, including details of time and place. This form serves primarily

as a cover sheet for the detailed description of the invention and *must* be kept unclassified.

"The *Patent Disclosure Data Sheet* is used to provide a detailed description of the invention, along with illustrative sketches. It should provide a complete description of the invention with as many drawings as necessary to explain fully the making and operation of the invention. All essential elements in the drawings should be given reference numerals which relate back to the written description. This completed form will normally have the same security classification as the invention."

**4.** When the government reopened plaintiff's case in 1971, the original questionnaire was no longer in plaintiff's file.

**5.** The IEB was established on April 30, 1968, to review pending invention disclosures at Picatinny. Frankford Arsenal was no longer responsible for Picatinny patent determinations.

ever, Dr. A. Victor Erkkila, a patent agent in the Picatinny legal office, was assigned to prepare a patent application for the invention. After several conferences between Dr. Erkkila and Mr. Heinemann, during which Mr. Heinemann explained various aspects of the invention and reviewed Dr. Erkkila's draft, the final application was prepared.

In March 1972, Mr. Heinemann received a call from a secretary at the Picatinny legal office. The secretary told Mr. Heinemann that the patent application for his "Low Density Indirect Fire Munition System" had been prepared and that he should come down to sign it along with an assignment of the invention to the government. Mr. Heinemann challenged the need for an assignment and asked to speak with counsel. The individual with whom he spoke[6] told plaintiff that the assignment was required. Mr. Heinemann testified:

I spoke to the individual in the legal office who told me that I was—I asked him why would I have to assign this invention. I was told that this is a military invention. You are working in a military institute and the requirement in this installation is that you must sign an assignment to the invention.

I said, Well, what about invention rights questionnaire, and he responded that an invention rights questionnaire is only applicable to inventions which have commercial capabilities. This was a purely military invention and one which was not commercially oriented and that an assignment was demanded on the invention.

I was not happy with that, and he said, Well, I will send you a document which will show you that you will have to do that and, if you wish, also to give you some Army regulations which you can reference to look up.

\* \* \* \* \* \*

Based on the conversations I had, I looked at the regulations which were quoted and the documents that they were talking about and everything jived [sic].

Afterwards I got this particular document in the mail, a form. It is basically the record of invention, military record of invention, 00 Form 325, which states in one paragraph the executive order, at least that is what I thought it said. That was the law he was telling me to look at.

Under that particular document I could not retain entire rights in it.

The form plaintiff received from the Picatinny legal office set forth the provisions of Executive Order 10096, but with the significant omission of part (b)(4), which provides for certain circumstances in which "the entire right, title and interest in and to the invention" may remain with the employee. *See* 37 C.F.R. § 100.6(b), quoted below.

On March 23, 1972, plaintiff signed the Invention Rights Questionnaire along with a standard assignment form releasing to the government "the entire right, title and interest" in his invention, "in consideration of the rights of the Government of the United States acquired by virtue of the circumstances under which the above-entitled invention was made." On April 12, 1972, the Picatinny legal office filed a patent application for plaintiff's invention. Because plaintiff had signed the Invention Rights Questionnaire directly beneath the statement "I DESIRE TO ASSIGN TO THE UNITED STATES GOVERNMENT THE ENTIRE RIGHT, TITLE AND INTEREST IN AND TO THE ABOVE IDENTIFIED INVENTION," the government made no formal determination of his rights.

On March 25, 1974, a secrecy order was issued covering plaintiff's invention. The government rescinded the order on May 2, 1977, however, when it discovered that a device in a French patent was similar to plaintiff's invention and an application for a United States patent on its French counterpart had been filed. This rescission permitted normal prosecution of the patent application for plaintiff's invention to resume.

---

**6.** Plaintiff is unable to identify either the counsel or the secretary.

On September 27, 1977, United States Patent No. 4,050,381, now entitled "Low Density Indirect Fire Munition System," issued.

Plaintiff brought the present action on May 15, 1979, to contest the government's right to an assignment of, or license in, his invention. No administrative invention rights determination in accordance with Executive Order 10096 has ever been made.

### Discussion

The court is asked to determine the respective rights of the government and its employee, Mr. Heinemann, in Mr. Heinemann's invention. Under normal circumstances, this determination would have been made by plaintiff's employing agency in accordance with the standards and procedures of Executive Order 10096, 15 Fed. Reg. 389 (1950). *See Kaplan v. Corcoran,* 545 F.2d 1073 (7th Cir.1976). That order was promulgated on January 23, 1950, and its pertinent sections are codified, with modifications but substantially unchanged, at 37 C.F.R. § 100 (1983). The critical sections of Executive Order 10096, as codified, provide:

§ 100.3  *Scope.*

*This part applies to any invention made by a Government employee on or after January 23, 1950, and to any action taken with respect thereto.*

\*    \*    \*    \*    \*    \*

§ 100.6  *Determination of rights in and to inventions.*

(a) Subject to review by the Commissioner as provided for in this part, *each Government agency will determine the respective rights of the Government and of the inventor in and to any invention made by a Government employee while under the administrative jurisdiction of such agency.*

(b) The following rules shall be applied in determining the respective rights of the Government and of the inventor in and to any invention that is subject to the provisions of this part:

(1) The Government shall obtain, except as herein otherwise provided, the entire domestic right, title and interest in and to any invention made by any Government employee: (i) During working hours, or (ii) with a contribution by the Government of facilities, equipment, materials, funds or information, or of time or services of other Government employees on official duty, or (iii) which bears a direct relation to or is made in consequence of the official duties of the inventor.

(2) In any case where the contribution of the Government, as measured by any one or more of the criteria set forth in paragraph (b)(1) of this section, to the invention is insufficient equitably to justify a requirement of assignment to the Government of the entire domestic right, title, and interest in and to such invention, or in any case where the Government has insufficient interest in an invention to obtain the entire domestic right, title, and interest therein (although the Government could obtain same under paragraph (b)(1) of this section), the Government agency concerned shall leave title to such invention in the employee, subject however, to the reservation to the Government of a nonexclusive, irrevocable, royalty-free license in the invention with power to grant licenses for all governmental purposes, such reservation, in the terms thereof or where applicable in the terms required by 35 U.S.C. 266, to appear, where practicable, in any patent, domestic or foreign, which may issue on such invention.

(3) In applying the provisions of paragraphs (b)(1) and (2) of this section to the facts and circumstances relating to the making of a particular invention, it shall be presumed that an invention made by an employee who is employed or assigned: (i) To invent or improve or perfect any art, machine, design, manufacture, or composition of matter, (ii) to conduct or perform research, development work, or both, (iii) to supervise, direct, coordinate, or review Government financed or conducted research, development work, or both, or (iv) to act in a

liaison capacity among governmental or non-governmental agencies or individuals engaged in such research or development work, falls within the provisions of paragraph (b)(1) of this section, and it shall be presumed that any invention made by any other employee falls within the provisions of paragraph (b)(2) of this section. Either presumption may be rebutted by a showing of the facts and circumstances and shall not preclude a determination that these facts and circumstances justify leaving the entire right, title and interest in and to the invention in the Government employee, subject to law.

(4) In any case wherein the Government neither: (i) Obtains the entire domestic right, title and interest in and to an invention pursuant to the provisions of paragraph (b)(1) of this section nor (ii) reserves a nonexclusive, irrevocable, royalty-free license in the invention, with power to grant licenses for all governmental purposes, pursuant to the provisions of paragraph (b)(2) of this section, the Government shall leave the entire right, title and interest in and to the invention in the Government employee, subject to law.

Emphasis added.

Plaintiff asks this court to find that Executive Order 10096 does not apply to judicial proceedings and therefore the government's rights to the invention at issue should rest solely on the common law. Plaintiff argues:

> Executive Order 10096 * * * is directed only toward establishing a uniform patent policy for all federal agencies within the Executive Branch.

> \* \* \* \* \* \*

> [A] chief purpose of Executive Order 10096 is to expedite the processing of patent applications by the federal agencies so as to obtain the maximum rights in an invention for the Government * *.

> \* \* \* \* \* \*

Thus, Executive Order 10096 is intended to provide the administrative mechanism necessary for expediting the processing of employee invention disclosures within the Executive Branch. As such, its application is limited to the Executive Branch and the judiciary is to play no role in its implementation.

The court agrees that Executive Order 10096 is clearly meant to establish and maintain uniformity in this field. As the order states, its "purpose * * * is to provide for the *administration of a uniform patent policy* for the Government with respect to the domestic rights in inventions made by Government employees *and* to prescribe *rules and regulations for implementing and effectuating such policy.*" 37 C.F.R. § 100.1 (emphasis added). To provide government employees with the choice of pursuing rights determinations either through their agencies or through this court, and to apply the separate standards of the executive order or the common law according to which forum they choose, would frustrate that purpose of the Executive Order and destroy whatever uniformity now exists. As the United States Court of Appeals for the Seventh Circuit noted, the order is "controlling in the [determination of the] status of * * * [the government employee's] invention vis-a-vis government patent rights." *Kaplan v. Corcoran,* 545 F.2d at 1077. By its terms, the order "applies to any invention made by a Government employee." Therefore, the court finds that Executive Order 10096 provides the sole avenue for determining rights in inventions made by government employees. In addition, that determination is to be made by the employing agency, subject to review by the Commissioner of Patents and Trademarks. 37 C.F.R. §§ 100.5–.6.

Although § 100.6, the operative section for determining rights in an invention, does state guidelines for each governmental agency to follow when making that determination, in the present case no formal agency determination was made because plaintiff filed concurrently with his invention disclosure an invention rights questionnaire in which he voluntarily agreed to assign title to the government. That assign-

ment, however, was based on misinformation supplied to Mr. Heinemann by the government. Mr. Heinemann testified that he was misled by his conversations with counsel from the Picatinny legal office and by the incomplete copy of Executive Order 10096 counsel provided.

Under these circumstances, the assignment could not have been knowingly and freely given. Had he not been misled, plaintiff would have requested a formal rights determination. The appropriate remedy, however, is not to circumvent the clear procedures established by the order and have this court determine, *de novo,* the respective rights in plaintiff's invention. That a formal agency determination was not made is unfortunate but hardly irremediable.

It is therefore ordered, pursuant to RUSCC 60.1(a), that this case is remanded to Picatinny Arsenal for a final determination, in accordance with Executive Order 10096, of the respective rights of plaintiff and the government in plaintiff's invention. Proceedings in this court will be suspended for six months pending that final determination and pending any subsequent review by the Commissioner of Patents and Trademarks that either party may seek.

Counsel for defendant will, pursuant to RUSCC 60.1(a)(5), report to the court the status of the proceedings at intervals of 60 days, beginning May 1, 1984.